### No. 3185

### Second Circuit

**RITCHIE GROCERY CO., INC., v. USSERY ON OPPOSITION OF ELMER F. YANCEY**

(June 28, 1928. Opinion and Decree.)
(July 14, 1928. Rehearing Refused.)

B. T. Dawkins, of Alexandria, and W. C. Roberts, of Alexandria, attorneys for plaintiff, appellee.

C. H. McCain, of Colfax, attorney for third opponent, appellant.

ODOM, J. The Ritchie Grocery Company, Inc., obtained a judgment against P. M. Ussery on April 12, 1927. On June 9th following, it procured the issuance of a writ of fi. fa. under said judgment and on June 10th the Sheriff seized an automobile at Georgetown as the property of the judgment debtor.

On June 11th, E. F. Yancey filed with the Sheriff an affidavit setting up that the car seized was his property and not the property of Ussery. Later on Yancey intervened in the suit by way of third opposition, setting up that he had purchased the automobile from Ussery on or about January 1, 1927, paying therefor $385.00 cash and, in addition thereto, had assumed the payment of notes secured by chattel mortgage on the car amounting to $414.63, and that the car had been delivered to him in due course.

The Ritchie Grocery Company, Inc., in answer to the intervention, alleged that the car seized was the property of Ussery and was in his possession when seized; that there had not been a sale from Ussery to Yancey; and that even if there had been a form of sale gone through with between the parties that such alleged or purported sale was fraudulent, without consideration, without delivery, and was a simulation and made with the intent and purpose of placing the property beyond the reach of Ussery's creditors.

There was judgment in the District Court rejecting intervenor's demands and dismissing his intervention at his cost. He appealed.

OPINION

Both Yancey and Ussery testified that the sale of the car was verbal and took place in Ussery's store at Georgetown on or about January 1, 1927; that Yancey paid Ussery $385.00 in cash at the time of the sale and that Yancy agreed to assume and pay the notes against the car, amounting to $414.63, and that the car was at once delivered to Yancey and that he had been in possession thereof ever since and that it was in his possession when seized.

Yancey testified, and his testimony is not disputed, that he at once made application to the Commercial Credit Company, which owned the notes Ussery had given for the purchase price of the car, to have Ussery's interest in the car transferred to him and to have himself substituted as debtor, which application was approved by said Credit Company, and that he subsequently paid the nine notes due.

Yancey filed in evidence a written instrument, dated January 8, 1927, signed by the Credit Company, addressed to him, in which it is recited, among other things:

"We wish to advise that we have approved your application for transfer of the interest of P. M. Ussery to you, in consideration of which you hereby agree to stand responsible for the following payments, to be made on the following dates."

Then follows a stipulation that the terms of the original contract with Ussery are to remain in full force and effect and binding upon Yancey and setting out the amounts and dates on which the nine notes fell due.

There were no witnesses to the sale by Ussery to Yancey and no direct testimony to contradict their statements as to the sale, the payment of the cash and the delivery of the car.

So that unless the surrounding circumstances are such as to destroy the effect of the positive testimony that there was a bona fide sale and delivery of the car, the court must hold that the car was the property of the intervenor and was illegally seized as the property of Ussery.

In cases of this kind courts are warranted in disregarding the direct and positive testimony of the interested parties where the record is otherwise loaded with facts and circumstances which cast such taint and suspicion upon the transaction as to make it unbelievable that there was in fact a bona fide sale. But the circumstances which are alleged to throw doubt upon the verity of the sale should be carefully weighed and should be strong if the court is to hold, in effect, at least, that the parties to the sale have deliberately perjured themselves.

A reading of the record in this case has convinced us that there was in fact a sale and delivery of the property in controversy.

It is disclosed that Yancey is the son-in-law of Ussery and that they lived together in the same house during a portion of the time from the date on which the car was sold to the date on which it was seized.

Due to that intimate relationship, counsel say, and they cite authorities in support of the proposition, that the burden was upon Yancey, the intervenor, to establish the verity of the transaction.

Granting that the point is well taken, we hold that Yancey discharged that burden.

As already stated, it is not disputed that Yancey assumed and paid the balance due on the car, amounting to $414.63. But, as to the initial cash payment of $385.00, which Yancey and Ussery say was made, it is suggested that in all probability Yancey did not have that much money, and that if he did, it is not probable that he would have kept it in his pocket or lying around the house.

Yancey was a telegraph operator living on the outskirts of the village of Georgetown, where living expenses, no doubt, were no more burdensome than they are in rural sections. His family consisted of a wife only, and he received from $140.00 to $150.00 per month. His wife owned the house they were living in, having purchased it two years before they were married. He says their living expenses were nominal that he bought no "highpowered meat" but ate bacon. His father-in-law and mother-in-law lived with him and contributed their share of the household expenses. A sister-in-law also lived with them, but she was conducting a filling station of her own and contributed also.

We see no reason why Yancey could not have saved something from his salary under such conditions, as he says he did.

Now, as to the probability of his having as much as $385.00 in cash. He says his wife had some of the money and he had the balance. That is not improbable, when it is considered that they lived in what might be termed a rural section. It is not shown that there was a bank in Georgetown or at Woodsworth, the other small station where he worked a portion of the time. People who live in towns and cities where there are banks usually keep their money in them, but those in rural sections do not always use banks.

It is alleged and argued that the car was seized while in the possession of Ussery. The testimony does not warrant that holding.

In June, when the car was seized, Yancey was at work at Woodsworth, a short distance away, where, it seems, that he and his wife were temporarily residing. He took his wife in the car and drove to Georgetown to visit Ussery who was living in Mrs. Yancey's house. When he stopped the car at the house, the Sheriff seized it.

The residence where the car was seized was called "Uncle Pete's" house, "Uncle Pete" being Ussery. But Ussery did not own the place; he lived there, but it was owned by Yancey's wife and had been occupied by both Ussery and Yancey. The car was in Yancey's possession the day it was seized, he having carried it from Woodsworth to Georgetown, and it was seized on his wife's property.

It is argued that Ussery had possession of the car from the date of the sale to the date it was seized. The basis for that argument is that Ussery did use the car at times. It is natural that he should. They were all living in the same house and the car was kept on the premises until Yancey moved to Woodsworth, and after that Mrs. Yancey made frequent visits to see her father at Georgetown, carrying the car with her. It was always at Ussery's service when not in use by the Yanceys.

We are convinced that there was a delivery of the car to Yancey and that he possessed it all the while.

It is further argued that Yancey could not have made the payments on the car with his own funds and taken care of his other expenses.

Why not? He was paying $20.00 per month on an old Ford, $46.07 on the car in controversy, his living expenses were about $25.00 per month, plus about $6.00 for gasoline; total, $97.00. He was earning $140.00 per month. He had left $43.00 per month. He bought a house at Woodsworth for $100.00. He made two or three small payments on it and borrowed $85.00 from his mother to pay the balance and he still owes that. For two months previous to his purchase of the house at Woodsworth he leased it at $8.00 per month. With all these items he was living well within his means.

Counsel cite the case of Weil vs. Scarbrock et al., 156 La. 159, 100 South. 290. The "suspicious circumstances" there were much stronger than those here. In that case, a father sold to a minor son cattle worth $5040.00. The initial payment was $1500.00, which the son claimed he had saved over a period of years and put in a tool-box. But he was a minor working for his father for $20.00 per month and his board. The second payment of $1270.00 was made by the boy two months later with money which he claimed to have earned by butchering and selling cattle to undisclosed persons. The third payment of $1270.00 was made by the boy with money which he claimed to have borrowed from a relative. The relative was a farmer who did not draw the money, $2000.00, from a bank, although it was shown that he kept an account at the bank. There were other suspicious circumstances about these payments. In addition, the Court found that the father continued to exercise all rights of ownership over the cattle, had them dipped in his own name, sold cream in Alexandria and collected the price thereof, and the Court said:

"In fact he (the father) at all times, in

acts and in conversation, treated said cattle as his own."

Small wonder it is that the Court held that there was no sale by the father to the son.

In view of the positive testimony of Yancey and Ussery, whose reputation for truth and veracity is not assailed, that there was a sale for a consideration which was paid, and in view of the fact that Yancey had an income sufficient to enable him to save the amount of the initial payment on the car and to make the subsequent payments as well as pay his other expenses, we cannot hold that there was not a bona fide sale of the car, and we have found that there was delivery.

Ussery's store burned a few days after the car was sold and it is intimated that he was insolvent, but there is no proof that he was.

The District Judge has not favored us with a statement of his reasons for rendering the judgment which he did. As we see it, he manifestly erred.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be reversed, and it is now ordered adjudged and decreed that the Whippet car seized by the Sheriff of Grant Parish in the suit of Ritchie Grocery Company, Inc., versus P. M. Ussery, No. 6734, is the property of the intervenor, F. F. Yancey, and further ordered that the Sheriff of said parish release said seizure and deliver the property to said Yancey; all costs of this suit to be paid by the seizing creditor.

It is further ordered that whatever rights the intervenor had or has to claim damages be reserved to him.